IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                  Case No. 1:22-cr-00710-MLG-1

BUDDY GALLEGOS,

    Defendant.

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS

This matter comes before the Court on Defendant Buddy Gallegos' [sic] Motion to Suppress Evidence Seized from Mr. Gallegos' [sic] Work Truck Parked in Front of a Neighbor's Property and to Suppress Statements by Mr. Gallegos and Memorandum in Support Thereof ("Motion to Suppress"), filed May 2, 2023. Doc. 59. Having reviewed the parties' submissions and the applicable law and having held a hearing on the motion on July 18 and 19, 2023, the Court denies Gallegos's motion.

### BACKGROUND

Drug Enforcement Agency ("DEA") agents received information from a confidential informant ("CI") identifying Gallegos as "a large-scale methamphetamine and fentanyl pill distributor in the Albuquerque, New Mexico area." Doc. 65-1 at 17. The CI reported purchasing illegal drugs from Gallegos and that the CI had "observed multiple pounds of methamphetamine in a shed" at Gallegos's residence. *Id.* at 17-18. To substantiate these allegations, agents set up a controlled buy. *Id.* at 18-19.

In April 2022, agents dispatched the CI to the Gallegos residence (the "Premises") for the to purchase methamphetamines.[1] *Id.* After arriving at the Premises, the CI accompanied Gallegos to a shed situated in the backyard.[2] *Id.* at 19. The pair entered the structure, and once inside, Gallegos opened a cabinet and pulled a lever that revealed a hidden doorway. *Id.* The CI and Gallegos passed through the doorway, and the CI observed three firearms in the room, heroin on the shelf, and a backpack or bag containing ten to fifteen pounds of methamphetamine wrapped in plastic. *Id.* Gallegos offered to sell the CI what agents understood to be quantities of one thousand fentanyl pills at a price of three thousand dollars per thousand pills. *Id.* The CI agreed to contact Gallegos about fentanyl purchases in the future, and then exchanged cash for fifty-eight gross grams of methamphetamine. *Id.* at 19-20. The CI departed thereafter. *Id.*

Later that month, DEA Special Agent Kyle Coffey sought to obtain a search warrant for the Premises. The affidavit in support of the search warrant requested (and received) authorization to search "the entire residence, all attached and unattached garages and storage areas/containers/sheds (including mailboxes and trash cans) on the [Premises], and all persons located in the [Premises] in or on which the items to be seized could be concealed." *Id.* at 21. Significantly, the application also sought to search "all vehicles parked at, or in front of, the [Premises] that have an apparent connection to the [Premises] and/or [Gallegos]." *Id.* Contained within the search warrant application is a photograph of the Premises which includes a white GMC pickup truck with the words "Yellowstone Landscaping" painted on each side of the vehicle (referred to hereafter as the "work truck"). *Id.* at 22.

---

[1] DEA agents monitored the CI during the controlled buy. Doc. 65-1 at 18.

[2] The briefing and hearing testimony use the terms "garage" and "shed" interchangeably; it is the Court's understanding that these words refer to the same structure on Gallegos's property. This Memorandum Opinion and Order therefore uses the terms interchangeably as well.

2

On April 13, 2022, Magistrate Judge Laura Fashing signed the requested warrant. *Id.* at 1. That evening, DEA agents arrived at the Premises and conducted a search. Doc. 77 at 13:18-25-14:1-15, 147:19-22, 172:22-25. In the garage, agents recovered firearms, white powder, and a drug ledger. *Id.* at 61:23-25-62:1-8. They also found fentanyl, methamphetamine, cocaine, and a digital scale in the work truck. *Id.* at 44:2-21. Gallegos had an additional $1,760 in cash in one of his pockets. *Id.* at 40:1-7.

Agents detained Gallegos in the back of a police vehicle and attempted to use his face to unlock his phone using Face ID; during this encounter, Gallegos claims that they grabbed his neck to move his face in front of the camera. Doc. 78 at 68:15-25-69:1-9. While he was detained, agents read him his *Miranda* rights and spoke with him multiple times. Doc. 77 at 45:3-25-46:1-14.

Following the search, agents transported Gallegos to the DEA's Albuquerque office where he was interviewed. *Id.* at 66:21-25. Gallegos was asked if he recalled having his *Miranda* rights read to him previously, and he responded in the affirmative. 3/13/23 CD 2:02-2:12 (interview lodged with Court). Gallegos was released following the interview. Doc. 78 at 76:10-14. Subsequently, agents obtained an arrest warrant and Gallegos was taken into custody without incident. *Id.* at 76:17-23. He was charged with possession with intent to distribute methamphetamine and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B-C), being a felon in possession of firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924, and using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Doc. 16 at 1.

## ANALYSIS

Gallegos moves to suppress the evidence found in the work truck arguing the search of the truck went beyond the scope of the warrant. Doc. 59 at 5. He also moves to suppress the evidence

found in the garage because he claims the agents caused excessive damage to his home. *Id.* at 11. Finally, he moves to suppress the statements he made during the interview because the force used in attempting to unlock the phone with his face rendered his *Miranda* waiver involuntary through physical coercion. *Id.* at 12. The Court addresses each argument in turn.

### I. The search of the work truck

The warrant authorized DEA agents to search the premises and "all vehicles parked at, or in front of, the P[remises]" provided those vehicles could be connected to Gallegos through "prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key." Doc. 65-1 at 21. That Gallegos is "connected" to the work truck is without dispute; IRS queries show that he owns the vehicle. *Id.* at 18. Nevertheless, Gallegos argues that the search of his vehicle went beyond the scope of the warrant. Doc. 59 at 6. To assess the merits of Gallegos's argument, some further factual development is necessary.

On the day DEA agents executed the search warrant, a flatbed trailer was hitched to the work truck. *See* Doc. 59-4. The trailer was situated entirely in front of the Premises, but the parties dispute whether the same is true of any part of the work truck. According to the Government, the work truck's "tail bed straddled the fence line between the defendant's residence and the neighboring property" such that the work truck was partially in front of the Premises. Doc. 65 at 7; *see also* Doc. 77 at 41:6-9 (Agent Kyle Coffey testifying that "the trailer and part of the truck was parked physically on the property of Mr. Gallegos's residence."); *id.* at 156:23-25-157:1-3 (Agent Shields testifies that "part of" the work truck was parked on Gallegos's residence); 161:7-25. By contrast, a private investigator—retained by Gallegos—claims that the rear bumper of the work truck was separated from Gallegos's property line by approximately twenty-three inches. *See* Doc. 78 at 15:1-7. Gallegos and his wife also testified that no part of the work truck was situated

4

on the premises. *Id.* at 47:6-14, 63:9-18. Pictures taken at the time of the search do not clarify the matter; it is impossible to ascertain the precise location of the vehicle based on the images. *See* Doc. 59-4.

The Court need not determine the precise location of Gallegos's work truck. When construing the terms of a search warrant, courts are to determine a term's "*practical* meaning" rather than relying on "technical precision." *United States v. Ortega-Jimenez*, 232 F.3d 1325, 1329 (10th Cir. 2000), *holding limited by United States v. Suggs*, 998 F.3d 1125, 1136-37 (10th Cir. 2021) (emphasis in original); *see also Suggs*, 998 F.3d at 1133 (courts "construe search warrants in a practical and commonsense fashion, avoiding a hypertechnical reading of their terms"). And "[w]here a warrant authorizes the search of an entire property or premises, the scope of the warrant includes automobiles on the property or premises that are owned by or are under the dominion and control of the premises owner or which reasonably appear to be so controlled." *United States v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002) (citing *United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990)).

Here, the work truck was physically attached to a trailer that was parked directly in front of the Premises.[3] Doc. 77 at 39:3-6, 41:6-9, 92:22-25-93:1-9, 102:3-21, 134:3-14, 136:10-15.

---

[3] Gallegos argues that the agents "had authority to search the separate trailer but not the work truck as the work truck constitutes a separate vehicle" with a separate license plate, relying on *United States v. Abreu*, 935 F.2d 1130, 1133 (10th Cir. 1991) in support. Doc. 59 at 6-7. *Abreu* involved the search of a tractor-trailer in which the defendant had title to the tractor (i.e., the truck cabin), but not the trailer (i.e., the freight unit), to which a different individual held the title. 935 F.2d at 1131-32. A search of the trailer revealed cocaine. *Id.* The defendant was not present in the tractor-trailer for the search—two other individuals were driving it. *Id.* The Tenth Circuit held that the defendant had no legitimate expectation of privacy in the trailer and therefore no standing to challenge the search because he held title only to the tractor and there was no evidence that the trailer's owner had authorized the defendant to use it. *Id.* at 1133. While *Abreu* did not consider the tractor-trailer a single unit, it did note that the linkage was "one factor tending to support a legitimate expectation of privacy" despite ultimately finding that a legitimate expectation of privacy was not present in that case. *Id.* The facts of the present case are in some ways the reverse

Because of the size of the trailer, "in order to fit the trailer [directly in front of Gallegos's property], it logically makes sense that Mr. Gallegos drove his truck a little bit further north." *Id.* at 136:19-23; *see id.* at 134:6-12 ("[D]ue to the length of the truck [Gallegos] was driving with the trailer, [pulling so far forward was] pretty much the best fit he could have had for parking the vehicle at the house that day, because it was so long."). Testimony from multiple witnesses indicates that the truck was approximately twenty-five to thirty feet from the home on the diagonal. *Id.* at 43:5-13, 161:15-17; Doc. 78 at 25:15-25. A person with their back against the front side of the residence could see the truck parked as long as they were tall enough to see over the fence. Doc. 78 at 81:11-16.

Given these facts, the Court finds that in a "practical and commonsense" reading of the warrant's language, the work truck was parked "in front of" the Premises. Gallegos has not met his burden to demonstrate that the vehicle search went beyond the scope of the warrant. This is true regardless of whether the work truck protruded a few inches onto Gallegos's property or was located entirely on the neighbor's property but attached to a trailer situated on the Premises.[4]

**II.    The search of the home**

---

of *Abreu*; the search here was of the truck cabin, where Gallegos himself was driving, and the present issue is the scope of a search warrant rather than Gallegos's authority to challenge a warrantless automobile search, which would be more comparable to *Abreu*. The Court therefore finds *Abreu* distinguishable.

[4] Moreover, even if the Court were to take the extreme position that the validity of the search turns on mere inches, the burden is on Gallegos to prove by a preponderance of the evidence that is so. *See United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018). The conflicting testimony and ambiguous photo evidence presented to the Court is insufficient to support a conclusion that, more likely than not, the work truck was parked entirely on the neighbor's property. To the contrary, the Court finds the agents' testimony credible and were a factual finding required, the Court would find that some part of the work truck was situated on the premises.

In executing the search of the Premises, Gallegos claims agents "tore numerous holes in the home's walls rendering the search unreasonable." Doc. 59 at 11. Based on this contention, he argues that all evidence recovered from his home should be suppressed. *Id*. at 10. The United States responds, "The agents created holes in the walls based on the informant's credible statement that the defendant was hiding drugs behind a false wall." Doc. 65 at 13. The Government also argues that because agents found hidden rooms containing firearms in the shed, "[i]t is therefore reasonable that agents would extend their search to the invasion of the walls in the residence to look for hidden compartments that may have contained additional items of evidentiary value." *Id*.

The execution of a valid search warrant is limited by standards of reasonableness. *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997). "The Fourth Amendment provides individuals with security in their homes, and a search warrant, even one properly supported and properly issued, is not a license to breach that security with impunity." *Id*. Rather, courts "determine what is or is not reasonable by weighing the degree to which a search or seizure intrudes on a suspect's reasonable expectation of privacy against the degree to which the intrusion is necessary to promote legitimate government interests." *United States v. Pacheco*, 884 F.3d 1031, 1040 (10th Cir. 2018).

The Supreme Court has held that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979). On the other hand, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). That is, not all Fourth Amendment violations due to unreasonable destruction of property will lead to suppression. However, *Ramirez* does contemplate the possibility of suppression if the damage is

sufficiently related to the discovery of particular evidence. *See id*. at 72 n.3 ("Because we conclude that there was no Fourth Amendment violation, we need not decide whether, for example, there was sufficient causal relationship between the breaking of the window and the discovery of the guns to warrant suppression of the evidence.").

Here, the destruction of the walls was reasonable given that the agents had learned of a hidden room accessible by a lever in the wall. The agents tore the holes in the walls for the purpose of finding such a hidden lever or compartment. Doc. 77 at 117:12-16. That effort proved to be fruitful. Agents located a compartment within the garage, which led to the discovery of firearms, white powder residue, and a drug ledger. *Id.* at 61:23-25-62:1-9. This case involved a legitimate government interest in searching for the hidden room that an informant reported in the garage; a greater level of intrusion was necessary based on these facts. Although this level of destruction certainly is not reasonable in every search, the facts of this case are such that the holes were not excessive enough to violate the Fourth Amendment. The Court denies this aspect of the Motion to Suppress.

### III.   Voluntariness of Gallegos's *Miranda* waiver

When determining the voluntariness of a confession, courts consider the totality of the circumstances to decide whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Sharp v. Rohling*, 793 F.3d 1216, 1229 (10th Cir. 2015) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). Some factors in the analysis of whether a *Miranda* waiver was voluntary are "the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010).

8

As for age, intelligence, and education, Gallegos was forty-one years old at the time of the hearing, and the interview took place approximately fifteen months prior. *See* Doc. 78 at 59:17-18; 3/13/23 CD (interview lodged with Court). Although the record does not include evidence of his education, he was employed successfully as a landscaper, having worked his way up from laborer to project manager. *Id.* at 60:1-12. Regarding the second factor, Gallegos was read his *Miranda* rights prior to the interview. *Id.* at 74:4-10. And as for the third factor, his interview, recorded and provided as an exhibit to the Court, lasted approximately twenty minutes. *See* Doc. 70 (notice of lodging of video recording). Taken together, Gallegos's maturity, intelligence, and awareness weigh in favor of voluntariness.

Conflicting testimony exists regarding whether Gallegos was subjected to physical force when agents attempted to use his face to unlock his phone. Gallegos testified that the agents grabbed his face or neck harshly enough to leave marks the next day and that for a "moment" he could not breathe due to being grabbed on the neck. Doc. 78 at 82:15; *see id.* at 72:1-25. One of the agents involved in the interaction, Agent Bryan Shields, testified that he did not grab Gallegos's face. Doc. 77 at 159:19-21. The other agent involved, Agent Collin Stradling, testified that neither he nor Agent Shields "la[id] a finger" on Gallegos during the interaction. *Id.* at 176:25-177:1-2. Both Gallegos and the agents testified that Gallegos was turning his face or pulling away during the agents' attempts to unlock Gallegos's phone. *Id.* at 175:10-15, 150:20-25-151:1; Doc. 78 at 70:7-13.

Even taking Gallegos at his word, the conduct Gallegos describes is not sufficient for the Court to find that his "will" was "overborne and his capacity for self-determination critically impaired." *Sharp*, 793 F.3d at 1229. The alleged force took place in the police car "approximately a couple of hours" before the interview at the DEA office according to Gallegos himself. Doc. 59

9

at 14. Gallegos testified that he did not seek medical attention for his injuries after he was released because he did not believe it was necessary. Doc. 78 at 84:25-85:1-11. Gallegos appeared to have no issues disagreeing with the agents during the interview—in fact, he repeatedly asserted that he was not a drug dealer and only possessed small quantities of illegal drugs for personal use notwithstanding the officers' questions and statements to the contrary. *See* 3/13/23 CD at 7:45-8:43, 9:06-9:58, 10:34-11:20, 11:55-12:46, 15:31-16:28 (interview lodged with Court). Although he occasionally moved in a way that could indicate pain or stiffness, he also raised his arm freely, and his direct speech and responsiveness to questions suggest that any pain he might have been experiencing did not interfere with his ability to understand what was being asked and communicate clearly. *See id.* at 11:58-12:11.

Given the preceding, the Court finds that Gallegos's *Miranda* waiver was voluntary. Therefore, it will not suppress his statements from the interview.

## CONCLUSION

The Court denies Gallegos's Motion to Suppress, Doc. 59, in its entirety. It is so ordered.

                                      UNITED STATES DISTRICT JUDGE
                                      MATTHEW L. GARCIA